## SOUTHWESTERN SURETY INS. CO. v. PEDEN. (No. 9309.)

(Court of Civil Appeals of Texas. Ft. Worth. April 17, 1920. Rehearing Denied May 15, 1920.)

**1. Guardian and ward ⟨⟩182(4)—Refusal to make surety party to action on former guardian's bond proper.**

In guardian's action on former guardian's bond for former guardian's failure to turn ward's funds over to guardian, demurrer to surety's answer seeking to make guardian's bondsmen parties to the suit on the ground that guardian failed to use diligence to collect funds and to take possession of personal property belonging to the estate, as required by Rev. St. arts. 4127, 4128, *held* properly sustained; the former guardian's surety not being concerned with guardian's negligence in the management of the estate.

**2. Guardian and ward ⟨⟩177—Surety not relieved in absence of petition and issuance of citation.**

Surety's letter to county judge requesting release from liability under guardian's bond did not relieve surety from liability, where no petition to be relieved therefrom was filed and where guardian was not cited to appear and give new bond, as required by Rev. St. arts. 3319, 4109.

**3. Guardian and ward ⟨⟩173—Guardian liable for failure to surrender funds to new guardian though bank refused to honor draft.**

That bank in which ward's funds had been deposited changed name of account to that of newly appointed guardian, but refused to honor a draft drawn by such guardian, did not relieve former guardian and his sureties for failure to turn over the money to recently appointed guardian.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Suit by R. F. Peden, as guardian, against the Southwestern Surety Insurance Company and another. Judgment for plaintiff, and named defendant appeals. Affirmed.

Capps, Cantey, Hanger & Short and W. D. Smith, all of Ft. Worth, for appellant.

McLean, Scott & McLean and W. Storer, all of Ft. Worth, for appellee.

BUCK, J. This is a suit brought by R. F. Peden, as guardian of the estate of Tina Ellison, a minor, against P. O'Brien, the former guardian, and the Southwestern Surety Insurance Company, which company, during the pendency of the suit, changed its corporate name to the Southern Surety Company, to recover the sum of $1,400, which it was alleged P. O'Brien received while he was guardian and failed to turn over to Peden, upon the latter's appointment.

O'Brien answered, after a general denial:

That he was the duly appointed guardian of the estate of Tina Ellison, and that there was turned over to him about $1,400 in money, as shown by his report on file in the probate court of Tarrant county. That, after paying all proper bills, he placed the balance in the Waggoner Bank & Trust Company, of Ft. Worth, on a four years' contract (some of the evidence showed that it was a five years' contract), and said bank agreed to pay him, on condition of his making said four years' contract, the sum of 5 per cent. interest per annum for said money. That the probate judge of Tarrant county did try to remove him as guardian on December 15, 1913, and appoint plaintiff as such guardian, but this defendant did not believe then, and does not believe now, that the probate judge had any right to remove him. He says that he went to the Waggoner Bank & Trust Company, while said money was deposited, and notified said bank that he was still guardian, and that it must not pay any money to R. F. Peden or any one else besides this defendant, and that it would only be allowed to pay out on his signature, and that of his bondsmen, jointly, and that if said bank paid out anything in any other way it would do so at its own risk. He further pleaded that he made the loan with the approval of his bondsmen, and that he acted in every way properly as guardian of the estate, and that the reason he had refused and now refuses to turn over said money to the plaintiff or to any one else was because he did not believe the probate court had any right to remove him from the said guardianship. This answer was filed December 10, 1917.

The defendant surety company answered by a general genial and general demurrer and certain special exceptions, not necessary here to notice. It further answered, admitting that it had made the bond of P. O'Brien in the sum of $2,800, and set out various transactions connected with the estate occurring prior to the appointment of Peden, on, to wit, December 15, 1913. It was alleged that, upon Peden's appointment, he took charge of the money on deposit at the said Waggoner Bank & Trust Company and thereafter exercised the control and direction of the same, and that said Peden as guardian of said estate had full knowledge that the funds belonging to said estate, which constituted the only property of said estate, had been deposited by the said P. O'Brien, as guardian, in the aforesaid bank, and further alleged that if said O'Brien, as guardian, and said bank, as said depository of said funds, failed and refused to deliver said money to said Peden, as guardian, as alleged by him, then defendant would show that it was the duty of said Peden, as such guardian, to pursue such remedies as the county court of Tarrant county would afford him for the recovery of

said money; and, upon his failure so to do, the defendant would be discharged. The defendant further answered that Peden as such guardian permitted such funds to remain on deposit in the Waggoner Bank & Trust Company, or the Ft. Worth Savings Bank & Trust Company, under its amended corporate name, and took no steps of any kind whatsoever either in the county court of Tarrant county, or in any other jurisdiction to recover said money, but acquiesced in the action of said P. O'Brien as guardian, in depositing the same with said Waggoner Bank & Trust Company. It further alleged that on July 23, 1915, the said Waggoner Bank & Trust Company went into the hands of a receiver, and that its affairs are still being administered by such receiver under appointment by the district court of Tarrant county, and that said Peden as such guardian was now seeking to recover in this suit of defendant the money lost in the failure of said bank, which was lost by his acquiescence and neglect in permitting said money to remain on deposit in said bank.

The evidence shows that Tina Ellison's mother was killed in 1907, leaving her six or seven year old daughter a $1,000 insurance policy. J. W. Stitt, an attorney, was employed by O'Brien, who was her grandfather, to collect this policy. Some six or seven years elapsed before the policy was collected. In the meantime, Tina Ellison was living in the Presbyterian Orphans' Home at Files Valley. On May 6, 1913, O'Brien was appointed guardian of the estate of Tina Ellison. One thousand dollars, the face value of the policy, was paid to O'Brien, who deposited it on June 5, 1913, in the Waggoner Bank & Trust Company, for a period of four or five years, which bank contracted to pay him 5 per cent. per annum as interest, and a further agreement between the surety company and the guardian, on one hand, and the bank, on the other, that no money was to be drawn out of the bank without the joint signatures of O'Brien and the representative of the surety company. Some $358.40, accumulated interest collected from the insurance company, was paid to the attorney for his services. On December 15, 1913, R. F. Peden was appointed guardian of the estate of Tina Ellison, at her instance; she alleging that she was more than fourteen years of age, and that under the statutes she was competent to choose her guardian. Upon his appointment, Peden went to the Waggoner Bank & Trust Company and notified the cashier that he had been appointed guardian of the estate of Tina Ellison and had learned that O'Brien, the former guardian, had said that he would not file his final account. He asked about the condition of the account and was informed that O'Brien had left it there on a five years' contract at 5 per cent. He reported this information to the county judge,

Jesse M. Brown, and informed him that in his judgment he ought to take steps to get possession of the funds and loan it out on real estate at 8 or 10 per cent. The county judge stated that in his opinion the bank would not turn the money over without a suit; that he went back to the bank and talked to them again, and they told them they would consult with their attorney about the matter. Later, he called upon the bank and was informed that, while they believed he had the better of the situation, yet they declined to turn the funds over to him. Some time after this, a bill for $8.70, for court costs, was presented to Peden for payment. This check was paid by the bank upon the indorsement of C. W. Head, agent for the surety company. This was the only money expended by Peden as guardian, and the only check drawn. On November 19, 1917, Peden, as guardian, filed this suit.

On June 15, 1914, O'Brien filed his annual account and report, which showed that there was on deposit at that time in the Waggoner Bank & Trust Company $946.12, owing to the estate. The county judge entered his approval of this report in the following words:

"The report of P. O'Brien examined and approved as showing the sum of $946.12 due R. F. Peden, guardian, on June 15, 1914.

"2-18-18.   Jesse M. Brown, County Judge."

Apparently this approval was made by the county judge February 18, 1918, subsequent to the filing of this suit.

On a trial before a jury, after the evidence was introduced, the court instructed the jury to find for plaintiff, against O'Brien as guardian and his bondsmen, the sum of $946.12, with interest at the rate of 10 per cent. per annum from June 5, 1914, and a judgment was entered upon this verdict, and the defendant surety company has appealed.

[1] Appellant's first, second, third, and fourth assignments of error, submitted together, complain of the peremptory instruction given for the plaintiff, and of the failure of the court to give a peremptory instruction in favor of the surety company. Appellant urges that the evidence shows that the funds belonging to the estate of the minor were lost because R. F. Peden, after his appointment as guardian, permitted them to remain on deposit at the bank after he had obtained at least constructive possession thereof and after they had passed out of the possession of O'Brien, and therefore the sureties on O'Brien's bond would not be liable for the loss of the money. Appellant in its answer sought to make Peden's bondsmen parties to the suit, but a special demurrer urged by the plaintiff to this part of defendant's answer was sustained. We do not think there was any error in sustaining this demurrer. Neither O'Brien nor his bondsmen had a cause of action against

Peden or his bondsmen. Appellant cites such authorities as Moore v. Hanscom, 101 Tex. 293, 106 S. W. 876, 108 S. W. 150, Murph v. McCullough, 40 Tex. Civ. App. 403, 90 S. W. 69, St. Paul Sanitarium v. Crim, 38 Tex. Civ. App. 1, 84 S. W. 1114, 21 Cyc. 273, and 12 R. C. L. 1162–1163, to sustain the assignments directed to the giving of the peremptory instruction in favor of the plaintiff and of the failure to give a peremptory instruction in favor of the surety company. The authorities relied on are not pertinent. They deal with the liability of a guardian and his bondsmen for negligence in the management of the estate, or conversion of the estate, in suits by the ward himself, or by a subsequent guardian against a former guardian. In the instant case, the surety company was not concerned about the question of Peden's negligence in the management of the estate, or his failure to use diligence to collect all claims or debts owing the ward and to recover possession of all property to which the ward had a claim and to take into possession the personal property belonging to the estate, as required by articles 4127 and 4128 of the statutes. There were two issues presented for determination in the trial: First, did O'Brien fail and refuse to turn over to Peden, upon the latter's appointment as guardian, the funds, in the bank? Second, if so, was the surety company liable upon O'Brien's bond? O'Brien denied in his answer that he had ever turned over the funds to Peden, and denied Peden's authority to act as such guardian, and denied that authority of the probate court to remove him as guardian.

The surety company introduced a letter written September 2, 1913, by the Southwestern Surety Company, Head, Teas & Company, general agents, to Judge Jesse M. Brown, county judge, as follows:

"The Southwestern Surety Insurance Company of Oklahoma have requested us, as general agents, to write you requesting that you release them from any further liability under their bond written in behalf of Mr. P. O'Brien, guardian of Tina Ellison. If there is any necessary steps for us to take in this matter, we will thank you to please advise us. Awaiting your advices in this matter, we remain,

"Yours Respectfully,
          "Head, Teas & Co., Gen. Agts."

Article 4109 of the statutes reads:

"A surety upon the bond of a guardian may be relieved from his bond, in the same manner and with like effect, as is provided in the case of a surety upon the bond of an executor or administrator."

Article 3319 provides:

"The sureties upon the bond of an executor or administrator, or any one of these, may, at any time, present a petition to the county judge praying that such executor or administrator may be required to give a new bond, and that he

or they may be discharged from all liability for the future acts of such executor or administrator, whereupon such executor or administrator shall be cited to appear and give a new bond."

[2] No petition is shown to have been filed or citation issued. Hence the surety company was not relieved from its liability on the bond in case O'Brien refused to turn over to the new guardian the funds on hand, and in case funds were lost, by reason of such refusal made, during the life of the bond.

The Waggoner Bank & Trust Company, under its amended corporate name of Ft. Worth Savings Bank & Trust Company, failed in July, 1915, and went into the hands of a receiver. Peden testified that before the failure of the bank he went to see the officials at the bank a number of times and was unable to get possession of the funds belonging to the estate; that he was informed that O'Brien had left the money there on a five years' contract at 5 per cent.; and that the only check he could get cashed, drawn against this fund, was the check of $8.70, court costs.

C. W. Head testified that he was of the firm who were general agents of the Southwestern Surety Insurance Company, which company made the bond of O'Brien as guardian. He further testified:

"As to what agreement Mr. O'Brien and I had as to how this money was to be drawn out of the bank, I will state we had the usual joint control agreement under which the money is deposited in the bank, and it is not supposed to be drawn out without both signatures—his signature and our signature as agents of the company. That is, in order to get the money out of the bank, Mr. O'Brien, as guardian, would have to sign that draft, as agent for the company, I would have to sign it. It wasn't to be drawn out except by the joint checks of the two. As to whether or not the bank was notified of that fact, I will say it is always our custom and I naturally presume that they were, for it is our custom to notify the bank or else it wouldn't be any good; as to whether or not the bank was notified in this particular case, I don't remember, but I presume it was. That is our custom, the custom of the insurance company. When we made a bond, it must be a joint check signed by the guardian and signed by me as agent for the insurance company. * * * As to how that notice is given, I will say we usually give them a copy of the agreement, which is signed by the guardian and we have to put our signature on it. * * * As to just what we mean by joint control agreement I will say, I mean joint control means that all money that is on hand at that time, the cash money that should come in the guardian's care is to be deposited to the estate, to be especially deposited to that particular bank, and under this joint control agreement, it cannot be drawn out without the signatures of the two. That means that both the guardian and the surety company would have to sign the checks. As to whether I know

why this money was deposited in the bank under the order of the Probate Court of this County, I will say, my recollection now it was deposited in the bank. The plan was to deposit it in the Continental Bank and Mr. O'Brien seemed to get an offer of a better rate of interest from this bank, and for that reason he put it down there in the other bank."

A. C. Alexander, formerly the cashier of the Waggoner Bank & Trust Company, testified for the defendant. He testified that he was cashier in June or July, 1913, and that he left the bank, then operating under the name of the Ft. Worth Savings Bank & Trust Company, on February 1, 1915; that he knew Mr. Peden, and that, the best he could remember of the transaction, the latter came in and talked to him about the Tina Ellison account; that he required Peden to show a certified copy of the court's order appointing him as guardian, and that he then changed on the books the account by scratching out O'Brien's name and writing Peden's name; that, subsequent to said change, the account stood in the name of Peden as guardian for Tina Ellison; that he believed that, if Peden had checked against this account after such change had been made on the books of the bank, he, as cashier, would have honored the check; that he would consider the change of the name of O'Brien to that of Peden as guardian was as complete a change as if O'Brien had given a check transferring the funds; that, after the change was made, the bank did not recognize O'Brien as having any right or claim to the funds, but regarded R. F. Peden as guardian, owner and custodian of said funds; that the penalty or cost to the guardian for withdrawing the funds at any time would be the forfeiture of the interest; that, after such transfer was made on the bank's books, the bank did have money with which to pay Peden if he had drawn a check against the account; that the bank probably had $150,000 or $200,000 in cash or exchange in other banks. He further testified:

"As to the insurance company, when that money was put there, having an agreement with me that it wasn't to be checked out except upon its joint check with Mr. O'Brien, I will state I didn't have such an agreement. I would have paid it out on O'Brien's check, I think, but not after the change was made. I think I would have paid it out on Mr. Peden's check, as guardian. I don't remember that I had written instructions from the insurance company, who were O'Brien's bondsmen, not to pay that money out unless it was on the joint check of them. I guess I paid that check (looking at check handed witness by counsel); I don't remember. The Southern Surety Company signed that; the Southern Surety Insurance Company, by some one; I don't remember who. I believe Head, general agent, P. O'Brien, guardian for Tina Ellison. * * * I think I would have paid it out on O'Brien's check. That is the best of my memory. It has been three or four years

ago, you understand, and I can't remember just what special instructions were on these accounts, but I am just going by the ordinary run of business. I would have paid it out that way at that time from the account just like it stands, if there had been no special instructions on file, but now there could have been special instructions on file that would have changed it. * * * I have something scratched out here. It is to be signed and countersigned by J. W. Head, of the insurance company. The check was to be countersigned by J. W. Head. That is what that book says. I write it, I wasn't writing lies down here on the book. Then, the account was put in there in the name of O'Brien as guardian, but the checks were to be signed by O'Brien as guardian, and to be countersigned by J. W. Head. That is what the book says, and I guess that is the truth."

[3] We conclude, in view of the last-quoted testimony of this witness and the testimony of Head, general agent for appellant, that it must be taken as established beyond controversy that the fund was put in the bank, without an order from court, by P. O'Brien, guardian, and was to be checked out on the joint signature of O'Brien and the agent for the surety company. The fact that the bank changed the name on its books, but refused to honor a draft drawn by Peden, would not relieve O'Brien as guardian and his sureties for his failure to turn over the money to Peden as guardian. Hence we conclude that the trial court did not err in refusing to give a peremptory instruction for the defendant surety company, and in giving a peremptory instruction for the plaintiff.

There are other assignments in the appellant's brief, but we do not believe that they present any error. All assignments of error are overruled, and the judgment is affirmed.